THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONELMO GOODUM, Defendant-Appellant.

Third District   No. 3—03—0003

Opinion filed May 6, 2005.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, and Edwin R. McCullough, of Chicago, for appellant.

James Glasgow, State's Attorney, of Joliet (Lawrence M. Bauer and Robert M. Hansen, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BARRY delivered the opinion of the court:

The defendant, Donelmo Goodum, was charged with Class 4 felony retail theft (720 ILCS 5/16A—3(a), 16A—10(2) (West 2002)). His motion to suppress the evidence was denied. Following a stipulated bench trial, the court found the defendant guilty and sentenced him to 60 months of T.A.S.C. probation. On appeal, the defendant argues that the court erred by denying his motion to suppress. We affirm.

## BACKGROUND

In its indictment, the State charged the defendant with having committed retail theft on March 14, 2002. On June 11, 2002, the defendant filed a motion to quash the arrest and suppress the evidence.

At the hearing on the motion to suppress, Joliet police officer Tizoc Landeros testified that during the early morning hours of March 14, 2002, he and his partner were on stationary patrol in their squad car in the parking lot of a Citgo station in Joliet. At approximately 3:20 a.m., the officers observed a Mazda automobile with two occupants pull into the gas pump area of the station. Landeros could not recall if the defendant was the driver or the passenger of the car. The defendant, however, testified that he was the passenger in the car. The defendant and Jessie Shaw exited the car and walked into the station. At that time, the officers did not know the identities of these two men.

After the car parked at the station, Landeros asked the radio dispatcher to run a background check on the car's license plate number. The dispatcher advised the officers that an arrest warrant was outstanding for the owner of the car, Larry Shaw. Later, the officers learned that Larry Shaw is Jessie Shaw's brother. At that time, the dispatcher neither advised the officers about the nature of the arrest warrant nor gave the officers a description of Larry Shaw.

As the defendant and Jessie Shaw returned to the car, the officers

drove their squad car into the gas pump area of the station and stopped with the squad car facing the front of the Mazda. The following exchange took place between the prosecutor and Landeros concerning his encounter with the defendant:

"Q. Which side of the car did you approach Mr. Goodum on?

A. I was sitting I believe—I don't remember where I was, if I was driving or I was the passenger of the squad car, but when we exit[ed] them they were both in front of the Mazda. We approached the front of the Mazda with our squad cars [*sic*], so they were almost facing each other to an angle, angled off a little bit."

Landeros then approached the defendant and the other officer approached Jessie in the space between the squad car and the Mazda.

Landeros asked the defendant for his name, which the defendant told the officer. The defendant also correctly spelled his name for Landeros. When the officer asked the defendant for identification, the defendant said that he did not have identification. The defendant also told Landeros his birth date. The officer then called the dispatcher with the defendant's name and date of birth. The dispatcher stated that there were no warrants outstanding for the person with that name and date of birth.

Landeros said he then asked the dispatcher for a description of Larry Shaw. The officer said that the description the dispatcher gave him closely matched the defendant's height, weight, and age. At that point, Landeros believed that the defendant was Larry Shaw and was lying about his identity. Landeros' partner received identification from the other recent occupant of the car indicating that he was Jessie Shaw.

Landeros noticed that the defendant's "coat was a little bulky" and that there were "bulges in his coat." Landeros also observed that the defendant was a "little nervous."

The officer asked the defendant "what was in his coat." Landeros then testified as follows:

"He said a sandwich which is a little weird just to have a sandwich, bulky sandwich in your coat. However, we still believed that he was possibly lying to us about his name due to the warrant, so I patted him down for weapons also and possibly any identification or anything like that."

Defense counsel asked Landeros, "Did you fear for your safety *** with the defendant?" Landeros answered, "It made me suspicious of the way he was acting so I didn't—we didn't know what we had at the time. He—yeah, maybe, yes, a little bit." The following exchange also took place between the defendant's attorney and Landeros:

"Q. And based upon your training and experience were you in

fear of your safety at that point believing that this may in fact be Larry Shaw?

A. Yes, just because you don't know how somebody is going to react when they find out that they're going to be apprehended by the police *** on a warrant or *** be arrested."

The following exchange took place between the prosecutor and Landeros:

"Q. How did you proceed to do the pat search?

A. With my hands started around the waist area, the pants. Normally that's where most people have weapons. After that I felt *** various bulky objects in the coat, went to the legs, over the pants of the pockets with an open hand.

* * *

I didn't feel that the mushy items in the coat right away would hurt me or my partner *** so [I] just kept moving on patting over the pockets, the rear pockets, the legs, up high in the coat toward the chest area, armpits."

While Landeros was patting one of the defendant's rear pants pockets, the officer felt what he thought was a pipe used for smoking crack cocaine. The officer testified that he saw what appeared to be the end of a crack pipe sticking out of the defendant's pocket. Landeros retrieved the crack pipe from the defendant's pocket. The officer stated that, "after finding the pipe we knew we could charge him with that so we were detaining him for that."

Landeros then searched inside the defendant's coat. Landeros said, "I [did not] want to have him start reaching in his coat, pull out any surprises, so you know, I unzipped his coat and retrieved various food items from his coat."

At the conclusion of the suppression hearing, the judge denied the motion to suppress without making any factual findings. The matter proceeded to a stipulated bench trial in which the court found the defendant guilty of retail theft for having stolen the food items from the gas station. The court imposed sentence and the defendant appealed.

## ANALYSIS

The defendant contends that the trial court erred by denying his motion to suppress.

Because a trial court's ultimate decision concerning a motion to suppress is a question of law, our review is *de novo*. *People v. Simac*, 321 Ill. App. 3d 1001, 748 N.E.2d 798 (2001).

■ Under the fourth and fourteenth amendments to the Constitution of the United States, a person has a right to be secure against unreasonable searches and seizures. U.S. Const., amends. IV, XIV. In

*Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the United States Supreme Court announced an exception to the general rule that warrantless searches are unreasonable. *Terry* permits a police officer to temporarily detain an individual when the officer's observations create a reasonable, articulable suspicion that the individual has committed or is about to commit a crime. Additionally, an officer may pat down an individual during a *Terry* stop, but only if the officer reasonably believes the individual is armed and dangerous. *Terry*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. DeLuna*, 334 Ill. App. 3d 1, 777 N.E.2d 581 (2002).

■ A single bulge in a defendant's clothing, by itself, does not justify a *Terry* stop and pat-down search. See 4 W. LaFave, Search & Seizure § 9.5(a), at 248 (3d ed. 1996). However, such a bulge, when combined with other circumstances related to the original reason for the *Terry* stop, is sufficient to justify a *Terry* frisk. See *People v. Morales*, 221 Ill. App. 3d 13, 581 N.E.2d 730 (1991). "[I]f in response to inquiries the suspect gives an implausible account of his actions, this can help establish grounds to frisk." 4 W. LaFave, Search & Seizure § 9.5(a), at 250 (3d ed. 1996).[1] Other circumstances that may be combined to raise a reasonable, articulable suspicion include the lateness of the hour and a suspect's nervousness. See *Michigan v. Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983); *People v. Smith*, 331 Ill. App. 3d 1049, 780 N.E.2d 707 (2002).

Additionally, an object discovered by the officer's sense of feel during the frisk may give the officer probable cause to believe that the object is contraband. In such a case, a further search is then justified because of that newly acquired probable cause. *Minnesota v. Dickerson*, 508 U.S. 366, 124 L. Ed. 2d 334, 113 S. Ct. 2130 (1993); *Morales*, 221 Ill. App. 3d 13, 581 N.E.2d 730.

■ The custodial arrest of a suspect based on probable cause is a reasonable intrusion under the fourth amendment, and a search incident to that arrest requires no additional justification. *United States v. Robinson*, 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973); *People v. Morales*, 343 Ill. App. 3d 987, 799 N.E.2d 986 (2003). An arrest occurs when a reasonable person would believe he was not free to leave. *People v. Booth*, 265 Ill. App. 3d 462, 637 N.E.2d 580 (1994).

■ In the present case, Landeros asked the dispatcher to run a background check on the license plate number of the Mazda, which was parked in plain view at the gas station. Requesting such a background check on a parked car's license number does not require

---

[1]LaFave cited *State v. Valentine*, 134 N.J. 536, 636 A.2d 505 (1994), which we may only consider as persuasive authority.

an officer's observation of illegal or suspicious behavior on the part of the car's occupants.

" 'What a person knowingly exposes to the public,' the Supreme Court declared in *Katz v. United States*,[2] 'is not a subject of Fourth Amendment protection.' This being so, it is apparent that when a vehicle is parked *** in a lot or at some other location where it is readily subject to observation by members of the public, it is no search for the police to look at the exterior of the vehicle." 1 W. LaFave, Search & Seizure § 2.5(a), at 554 (3d ed. 1996).[3]

See also *People v. Brand*, 71 Ill. App. 3d 698, 390 N.E.2d 65 (1979) (no search for officer to call in license number of moving vehicle for registration check).

■ After Landeros learned from the dispatcher that the owner of the car, Larry Shaw, was wanted on an arrest warrant, he had a reasonable suspicion that one of the car's recent occupants might be Larry Shaw. Thus, Landeros had a reasonable, articulable suspicion that one of the car's recent occupants had committed a crime and was subject to arrest. Under *Terry*, the officer was justified in briefly detaining the defendant, after the defendant emerged from the convenience store.

As Landeros questioned the defendant about his identity, Landeros noticed that his coat was "bulky" and exhibited "bulges." Landeros combined this observation with other circumstances related to the original reason for the *Terry* stop. See *Morales*, 221 Ill. App. 3d 13, 581 N.E.2d 730.

The defendant gave the implausible explanation that multiple bulges in his coat were caused by a single sandwich. Having received an implausible explanation for the bulges in the coat, Landeros had little reason to believe the defendant's assertion that he was Donelmo Goodum and not Larry Shaw. Individuals routinely give false names and dates of birth to police officers. See, *e.g.*, *People v. Ellis*, 199 Ill. 2d 28, 765 N.E.2d 991 (2002); *People v. Brown*, 172 Ill. 2d 1, 665 N.E.2d 1290 (1996); *People v. Simpson*, 129 Ill. App. 3d 822, 473 N.E.2d 350 (1984).

The encounter took place at the late hour of 3:20 a.m. See *Long*,

---

[2]*Katz v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967).

[3]LaFave cited the following: *United States v. Hensel*, 699 F.2d 18 (1st Cir. 1983) (no search to view license on car parked in driveway); *State v. Harding*, 137 Ariz. 278, 670 P.2d 383 (1983) (noting license plate number on car being driven and calling in for license check was not a search); *State v. Richter*, 145 N.H. 640, 765 A.2d 687 (2000) (visual inspection of license plate mounted on moving car in public view, as well as random computer check of license, was not a search).

.

463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469; *Smith*, 331 Ill. App. 3d 1049, 780 N.E.2d 707. Landeros observed that the defendant seemed nervous. See *Smith*, 331 Ill. App. 3d 1049, 780 N.E.2d 707. The combined circumstances, which included the bulges in the defendant's coat, the defendant's implausible explanation for the bulges, Landeros' reasonable belief that the person before him was subject to arrest, the lateness of the hour, and the defendant's nervousness, gave Landeros a reasonable, articulable suspicion that the defendant might be armed and dangerous. See *Morales*, 221 Ill. App. 3d 13, 581 N.E.2d 730. Thus, under *Terry*, Landeros was justified in frisking the defendant.

As Landeros patted down the defendant, he discovered a crack pipe by feel and in plain view sticking out of the defendant's pants pocket. Even though the frisk revealed that the bulges in the defendant's coat were not weapons, Landeros now had probable cause to seize the crack pipe and arrest the defendant for its possession. See *Morales*, 343 Ill. App. 3d 987, 799 N.E.2d 986. Regardless of whether Landeros told the defendant that he was under arrest, the defendant was not free to go. Therefore, he was under arrest. See *Booth*, 265 Ill. App. 3d 462, 637 N.E.2d 580. Landeros then was justified in conducting a more thorough search incident to that arrest. See *Robinson*, 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467; *Morales*, 343 Ill. App. 3d 987, 799 N.E.2d 986. It was during the search incident to the arrest that Landeros found the stolen items that were the subject of the motion to suppress.

In summary, the incremental steps in the circumstances of this case justified Landeros' search inside the defendant's coat and seizure of the food items concealed inside the coat. The circumstances led from a *Terry* stop, to a *Terry* frisk, to probable cause to arrest, and finally, to a search and seizure of evidence incident to an arrest.

## CONCLUSION

For the foregoing reasons, we hold that the trial court did not err as a matter of law by denying the defendant's motion to quash the arrest and suppress the evidence. Thus, we affirm the judgment of the Will County circuit court.

Affirmed.

McDADE and O'BRIEN, JJ., concur.